IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:15-CV-250-D

| | | |
|---|---|---|
| BLACKROCK ENGINEERS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| DUKE ENERGY PROGRESS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

On November 25, 2015, BlackRock Engineers, Inc. ("BlackRock" or "plaintiff") filed a corrected complaint against Duke Energy Progress, LLC ("Duke Energy" or "defendant"), AMEC Foster Wheeler Environment & Infrastructure, Inc. ("AMEC"),[1] and Charah, Inc. ("Charah")[2] alleging copyright infringement, breach of contract, unjust enrichment, conversion and misappropriation, common law unfair competition, trademark infringement under North Carolina law, and violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1 et seq. [D.E. 5]. On December 14, 2017, Duke Energy filed an amended answer and asserted a counterclaim against BlackRock for declaratory judgment that BlackRock committed fraud on the copyright office and that BlackRock's copyrights are invalid, void, or unenforceable based on BlackRock's fraud [D.E. 99].

On November 16, 2018, BlackRock moved for partial summary judgment [D.E. 120] and filed a memorandum in support [D.E. 121], a statement of material facts [D.E. 123], and an appendix [D.E. 124, 131, 133, 136, 137]. On December 21, 2018, Duke Energy responded in opposition [D.E.

---

[1] On December 18, 2018, BlackRock dismissed AMEC with prejudice [D.E. 175].

[2] On March 29, 2016, BlackRock voluntarily dismissed Charah without prejudice [D.E. 30].

183] and responded to BlackRock's statement of material facts [D.E. 186]. On January 11, 2019, BlackRock replied [D.E. 198].

On November 16, 2018, Duke Energy moved for summary judgment [D.E. 132] and filed a memorandum in support [D.E. 134], a statement of material facts [D.E. 135], and an appendix [D.E. 138, 139–58]. On December 21, 2018, BlackRock responded in opposition [D.E. 180], filed exhibits [D.E. 181–82], responded to Duke Energy's statement of material facts [D.E. 184], and filed an appendix [D.E. 185, 187–90]. On January 11, 2019, Duke Energy replied [D.E. 199] and responded to BlackRock's statement of material facts [D.E. 200].

On November 16, 2018, Duke Energy moved to strike "all evidence" from BlackRock concerning Gary Ahlberg's ("Ahlberg") damages calculation [D.E. 161] and filed a memorandum in support [D.E. 162]. On December 21, 2018, BlackRock responded in opposition [D.E. 179]. On January 4, 2019, Duke Energy replied [D.E. 193].

On February 26, 2019, Duke Energy moved to strike Ahlberg's affidavit that BlackRock submitted in its response to Duke Energy's motion for summary judgment [D.E. 204], filed a memorandum in support [D.E. 205], and filed exhibits [D.E. 206–12]. On March 13, 2019, the parties jointly moved for extensions of time to file, which the court granted [D.E. 216]. On March 27, 2019, BlackRock moved for an additional extension of time to respond [D.E. 222]. On March 28, 2019, Duke Energy responded in opposition [D.E. 223]. On April 1, 2019, Duke Energy moved for adjudication of its motion to strike because BlackRock did not timely respond [D.E. 224]. On April 5, 2019, BlackRock responded in opposition to Duke Energy's motion to strike [D.E. 226], filed exhibits [D.E. 227], and responded in opposition to Duke Energy's motion for adjudication [D.E. 230]. On April 22, 2019, Duke Energy replied [D.E. 231].

As explained below, the court grants in part and denies in part Duke Energy's first motion to strike, grants BlackRock's motion for an extension, denies as moot Duke Energy's motion for adjudication, denies Duke Energy's second motion to strike, grants in part and denies in part

BlackRock's motion for partial summary judgment, and grants in part and denies in part Duke Energy's motion for summary judgment.

I.

Duke Energy is a public utility "created and operating under the laws of North Carolina." [D.E. 135] ¶ 1; [D.E. 184] ¶ 1.[3] Duke Energy, in part, operates coal-burning power plants in North Carolina, which produce coal ash residue. See [D.E. 123] ¶ 1; [D.E. 186] ¶ 1. Under North Carolina law, Duke Energy must store and dispose of coal ash residue and other solid waste in an environmentally safe manner. See [D.E. 123] ¶ 1; [D.E. 186] ¶ 1. Duke Energy owns and operates the Roxboro Lined Ash Monofill (the "Roxboro Landfill") in Semora, North Carolina, to store solid

---

[3] Under Local Civil Rule 56.1, a party opposing a motion for summary judgment shall submit "a separate statement including a response to each numbered paragraph in the moving party's statement [of material facts]." Local Civ. R. 56.1(a)(2). "Each numbered paragraph in the moving party's statement of material facts will be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement." Id. "Each statement by the movant or opponent . . . must be followed by citation to evidence that would be admissible, as required by Federal Rule of Civil Procedure 56(c)." Local Civ. R. 56.1(a)(4). Under Rule 56(c), a party disputing a material fact must support its position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Merely responding that a party "disputes" a material fact is insufficient under Rule 56 and Local Rule 56.1. See Howard v. Coll. of the Albermarle, 262 F. Supp. 3d 322, 329 n.1 (E.D.N.C. 2017), aff'd, 697 F. App'x 257 (per curiam) (unpublished).

Duke Energy repeatedly denies factual allegations without citing to evidence, which violates Local Rule 56.1. See [D.E. 186] ¶¶ 2, 5, 7–8, 11–13, 15–25, 27–41; [D.E. 200] ¶¶ 1–2, 5–14, 16–22, 24–31, 33–36. Because Duke Energy frequently does not oppose BlackRock's statement of material fact by citing to particular parts of the record or showing that BlackRock cannot support its position based on the evidence in the record, the court deems those material facts admitted. See ABL & Assocs. Plumbing, LLC v. United States, No. 5:16-CV-918-D, 2019 WL 2221588, at *2 n.1 (E.D.N.C. May 21, 2019) (unpublished); Alford v. Rosenberg, No. 7:16-CV-376-D, 2019 WL 1968048, at *1 n.2 (E.D.N.C. May 2, 2019) (unpublished), appeal docketed, No. 19-1597 (4th Cir. 2019); Horton v. Methodist Univ., Inc., No. 5:16-CV-945-D, 2019 WL 320572, at *1 n.1 (E.D.N.C. Jan. 23, 2019) (unpublished), appeal docketed, No. 19-1174 (4th Cir. 2019); Felton v. Moneysworth Linen Serv., Inc., 295 F. Supp. 3d 595, 597 n.1 (E.D.N.C. 2018); Howard, 262 F. Supp. 3d at 329 n.1.

3

waste produced at its Roxboro power plant. See [D.E. 135] ¶¶ 4–5; [D.E. 184] ¶¶ 4–5; [D.E. 123] ¶ 1; [D.E. 186] ¶ 1. BlackRock is an engineering firm that "specializes in solid waste landfill services, including the design and permitting of landfills." [D.E. 135] ¶ 2; [D.E. 184] ¶ 2.

"North Carolina requires every solid state waste management facility to obtain a Permit to Construct ("PTC") issued by the Solid Waste Management Section of the North Carolina Department of Environmental Quality ("DEQ")" before constructing a landfill. [D.E. 135] ¶¶ 6, 10; [D.E. 184] ¶¶ 6, 10.[4] PTC applications must contain "detailed plans and specifications prepared by a professional engineer" that include "a grading plan, construction plan, [and] site development showing phases or progression of operation in five-year or ten-year phases of construction and operation." [D.E. 135] ¶¶ 7, 9 (alteration and quotation omitted); [D.E. 184] ¶¶ 7, 9.[5] Once a facility owner completes landfill construction, a professional engineer must prepare a Construction Quality Assurance Report ("CQA Report") that certifies that "the landfill was constructed properly and consistent with the plans approved under the PTC." [D.E. 135] ¶¶ 11–12; [D.E. 184] ¶ 11–12. "The CQA Report comprises technical drawings and text reflecting the as-built conditions of the landfill." [D.E. 135] ¶ 13; [D.E. 184] ¶ 13. The DEQ then reviews the CQA Report and, if approved, issues to the facility owner a Permit to Operate ("PTO") to operate (i.e., store solid waste at) the landfill. See [D.E. 135] ¶¶ 14–15; [D.E. 184] ¶¶ 14–15.

In 1999, Duke Energy's predecessors, Carolina Power & Light Co. ("CP&L") and Progress Energy, Inc. ("Progress Energy"), hired Gary W. Ahlberg ("Ahlberg") to provide engineering services for the Roxboro Landfill based on Duke Energy's plan to transition the Roxboro Landfill from an unlined to a lined facility (the "Landfill transition plan"). See [D.E. 123] ¶ 4; [D.E. 186] ¶ 4; [D.E. 135] ¶¶ 18–19; [D.E. 184] ¶¶ 18–19. The parties agreed that the Landfill transition plan

---

[4] In September 2015, the North Carolina Department of Environment and Natural Resources ("DENR") changed its name to DEQ. For simplicity, this order refers to the agency as DEQ.

[5] The parties dispute the extent to which North Carolina law dictates or prescribes landfill design. Compare [D.E. 135] ¶ 8, with [D.E. 184] ¶ 8.

would occur in nine phases, but the parties dispute the extent of collaboration between Ahlberg and Duke Energy. Compare [D.E. 135] ¶ 20, with [D.E. 184] ¶ 20. The DEQ approved Phases 1 through 5 of the Landfill transition plan. See [D.E. 123] ¶ 6; [D.E. 186] ¶ 6.

Ahlberg performed under an Individual Project Contract No. 14574 (the "First Contract"), which was "periodically expanded and maintained active by amendments." [D.E. 123] ¶ 4; see [D.E. 186] ¶ 4; [D.E. 200] ¶ 2; [D.E. 133-1]. Several provisions of the First Contract are relevant. The First Contract allowed either party "to terminate the contract for convenience." [D.E. 135] ¶¶ 21, 23; [D.E. 184] ¶¶ 21, 23. The First Contract also deemed "any copyrightable material" to be "work for hire" under the Copyright Act, and Ahlberg "assigned all copyrights in any copyrightable materials produced thereunder to Duke Energy's predecessor-in-interest." [D.E. 135] ¶ 24; [D.E. 184] ¶ 24; [D.E. 133-1] 8 (emphasis in original). In addition, the First Contract provides that "any program, document, data or information supplied by [Ahlberg] to CP&L may be used, copied or disclosed by CP&L as necessary in the normal course of its business, notwithstanding any copyright of [Ahlberg] in such materials and notwithstanding any notices or legends appearing thereon." [D.E. 135] ¶ 24; [D.E. 184] ¶ 24; [D.E. 133-1] 13.

In 2006, Ahlberg formed BlackRock, and BlackRock assumed all contracts and responsibilities of Ahlberg. See [D.E. 123] ¶ 5; [D.E. 200] ¶ 1. BlackRock adopted a triangular logo as a service mark to identify its business. See [D.E. 123] ¶ 7; [D.E. 186] ¶ 7. In September 2011, BlackRock claims that Progress Energy requested recommendations for future phase plans from BlackRock. See BlackRock Add. [D.E. 184] ¶ 4; [D.E. 200] ¶ 4. In response, BlackRock requested a contract extension. See BlackRock Add. [D.E. 184] ¶ 5; [D.E. 200] ¶ 5. In March 2012, Progress Energy and BlackRock executed Amendment 30 to the First Contract, expanding the scope of BlackRock's work at the Roxboro Landfill "to include engineering support for the design and permitting of new capacity additions Phases 6 through 9." [D.E. 135] ¶ 27; [D.E. 184] ¶ 27; BlackRock Add. [D.E. 184] ¶ 7; [D.E. 200] ¶ 7. In Amendment 30, the parties "agreed that

BlackRock would retain a license to use work product but that such license rights shall not extend to any information or data that is specific to the Roxboro Plant, which shall remain the exclusive property of [Duke Energy]." [D.E. 135] ¶ 27 (emphasis in original; alteration and quotations omitted); [D.E. 184] ¶ 27; [D.E. 146] 3. BlackRock then created plans for Phase 6 of the Landfill transition plan, and BlackRock submitted the plans to Progress Energy. See [D.E. 123] ¶ 8; [D.E. 186] ¶ 8; [D.E. 135] ¶ 28; [D.E. 184] ¶ 28. The parties dispute the extent to which BlackRock and Duke Energy collaborated on the Phase 6 plans. Compare [D.E. 135] ¶ 28, with [D.E. 184] ¶ 28.

In January 2013, BlackRock and Progress Energy entered into a new Master Contract (the "Master Contract") to replace the First Contract. See [D.E. 123] ¶ 9; [D.E. 186] ¶ 9; [D.E. 135] ¶ 29; [D.E. 184] ¶ 29. The parties dispute when the Master Contract went into effect. Duke Energy contends that the Master Contract went into effect only after the parties executed a work authorization on August 7, 2013, while BlackRock claims that it went into effect on either April 1, 2012, or January 1, 2013, under the terms of the contract. Compare [D.E. 135] ¶ 29, with [D.E. 184] ¶ 29. The Master Contract retained provisions concerning termination. See [D.E. 135] ¶¶ 30–33. The Master Contract did not contain a "work made for hire" clause that would assign BlackRock's copyrights to Duke Energy or Progress Energy. See BlackRock Add. [D.E. 184] ¶ 9; [D.E. 200] ¶ 9. BlackRock then "provided engineering work on Phase 6" of the Landfill transition plan, "which included the preparation of many reports and technical drawings that were submitted to Duke Energy and to [DEQ]." [D.E. 123] ¶ 10; [D.E. 186] ¶ 10. BlackRock identifies various drawings that it prepared, each of which displayed BlackRock's name and service mark. See [D.E. 123] ¶¶ 11–12, 16. BlackRock claims, and Duke Energy disputes, that BlackRock provided these services under the terms of the Master Contract. Relevant here, BlackRock prepared a PTC application for Phase 6 and a CQA report stating that "the Phase 6A landfill was constructed in general accordance with the requirements of the Phase 6 [PTC], project drawings, and specifications." [D.E. 184] ¶ 20.

By 2014, Duke Energy decided to end its relationship with BlackRock. See [D.E. 123] ¶ 19; [D.E. 186] ¶ 19. Beginning in the fall of 2014, Duke Energy copied BlackRock's "technical drawings and materials generated by BlackRock" and distributed these materials to AMEC. See [D.E. 123] ¶¶ 21–22; [D.E. 186] ¶¶ 21–22. On November 17, 2014, Duke Energy issued a cease work directive to BlackRock, and on December 5, 2014, Duke Energy unilaterally terminated its contractual relationship with BlackRock and began working with AMEC. See [D.E. 135] ¶¶ 34–35; [D.E. 184] ¶¶ 34–35; [D.E. 123] ¶ 20. AMEC used and copied BlackRock's technical drawings in preparing reports to submit to DEQ "for activities relating to the Roxboro Landfill." [D.E. 123] ¶ 25; [D.E. 186] ¶ 25; see [D.E. 123] ¶¶ 26–31; [D.E. 135] ¶ 39; [D.E. 184] ¶ 39.

On December 18, 2014, less than two weeks after Duke Energy terminated the Master Contract, BlackRock contacted DEQ "to retract its certification of the Phase 6A CQA Report that BlackRock had previously submitted to the agency to obtain a [PTO] for Phase 6" of the Landfill transition plan for Duke Energy. [D.E. 135] ¶ 36; [D.E. 184] ¶ 36; BlackRock Add. [D.E. 184] ¶¶ 21–24; [D.E. 200] ¶¶ 21–24. In response, DEQ "requested that Duke Energy submit a report in response to the issues raised" by BlackRock. [D.E. 135] ¶ 36; [D.E. 184] ¶ 36. On February 9, 2015, DEQ issued a PTO for Phase 6 to Duke Energy. See [D.E. 135] ¶¶ 37, 49; [D.E. 184] ¶¶ 37, 49. In April 2015, DEQ required Duke Energy to submit an "Annual Progress Report for Dam Safety Certificate of Approval for the Roxboro Landfill." [D.E. 123] ¶ 13; [D.E. 186] ¶ 13. AMEC prepared the report for Duke Energy, which included copies of BlackRock technical documents. See [D.E. 123] ¶¶ 14–15; [D.E. 186] ¶¶ 14–15.

On August 17, 2015, BlackRock applied to obtain copyright registrations for "its intellectual property," [D.E. 121] 11–12, including its August 2013 PTC for Phase 6 and its October 2014 CQA Report for Phase 6A. See [D.E. 123] ¶¶ 32, 34; [D.E. 186] ¶¶ 32, 34; [D.E. 135] ¶ 40; [D.E. 184] ¶ 40. The United States Copyright Office granted BlackRock's copyright applications. See [D.E. 123] ¶¶ 33, 35; [D.E. 186] ¶¶ 33, 35; BlackRock Add. [D.E. 184] ¶ 19; [D.E. 200] ¶ 19. In 2017,

7

BlackRock applied to supplement its copyright registrations, which the Copyright Office granted on July 2, 2018. See [D.E. 123] ¶¶ 37–41; [D.E. 186] ¶¶ 37–41.

## II.

### A.

Duke Energy moves to strike all evidence from BlackRock or Ahlberg concerning damages because "Ahlberg's testimony should have been offered by an expert, but was instead offered by" Ahlberg as a lay witness. [D.E. 161] 1. BlackRock seeks two types of damages: "(1) business loss to BlackRock arising from the complete destruction of its business when [Duke Energy] terminated its services in bad faith and provided BlackRock's proprietary work product to BlackRock's competitor, measured by the amount of income BlackRock reasonably expected to have earned during the remaining term of the Master Contract; and (2) recovery of the savings and profits realized by [Duke Energy] when [Duke Energy] gained the right — through the infringement of BlackRock's copyrighted works — to expand the capacity of the Roxboro Landfill and dispose of coal ash waste generated by the Roxboro Plant on its own premises." [D.E. 179] 1–2. BlackRock seeks $1,739,296 in business losses and $229,036,487 in savings and profits realized by Duke Energy. See [D.E. 179] 4, 5. BlackRock presents only Ahlberg as a witness concerning damages.

Under Rule 701 of the Federal Rules of Evidence, "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701; see Gallagher v. S. Source Packaging, LLC, 568 F. Supp. 2d 624, 632–33 (E.D.N.C. 2008). "The modern trend favors the admission of opinion testimony, provided that it is well founded on personal knowledge as distinguished from hypothetical facts and susceptible to specific cross-examination." MCI Telecommc'ns Corp. v. Wanzer, 897 F.2d 703, 706 (4th Cir. 1990) (quotation, alteration, and citation omitted); see Lord & Taylor, LLC v. White

Flint, LP, 849 F.3d 567, 575 (4th Cir. 2017); United States v. Perkins, 470 F.3d 150, 155–56 (4th Cir. 2006).

As for Ahlberg's opinion concerning BlackRock's business losses, Ahlberg's opinion is based on a report by BlackRock's external accountant concerning BlackRock's normalized profit margins, not on Ahlberg's personal knowledge or experience in the engineering field. See Ex. B [D.E. 162-1] 9–13. BlackRock may not present its accountant's report as Ahlberg's lay opinion and thereby circumvent Rule 702 of the Federal Rules of Evidence. See Gallagher, 568 F. Supp. 2d at 633; Static Control Components, Inc. v. Darkprint Imaging, Inc., 240 F. Supp. 2d 465, 481 (M.D.N.C. 2002) (noting that, while "business owners and officers [may] testify as lay witnesses under [Rule] 701," such witnesses "must possess personal knowledge of the lost profits and damages and may not rely on hearsay"). To the extent that Ahlberg offers a lay opinion based on BlackRock's external accountant's report, the court grants Duke Energy's motion to strike.

As for Ahlberg's opinion concerning Duke Energy's potential savings, Ahlberg lacks personal knowledge of relevant Duke Energy data. See [D.E. 162-1] 21–22. That is, Ahlberg bases any such opinion on hypothetical facts, not on his personal knowledge. Accordingly, the court grants Duke Energy's motion to strike such evidence. Thus, the court grants in part and denies in part Duke Energy's motion to strike BlackRock's evidence concerning damages.

B.

Duke Energy next moves to strike Ahlberg's affidavit, [D.E. 180-1], and for an award of its reasonable expenses [D.E. 204]. Duke Energy argues that Ahlberg's affidavit—which BlackRock submitted in its response in opposition to Duke Energy's motion for summary judgment—violates the Federal Rules of Evidence, violates BlackRock's duty to supplement its discovery responses, and is a sham affidavit. See [D.E. 205] 4–5. For good cause shown, the court grants BlackRock's motion for an extension and denies as moot Duke Energy's motion for adjudication.

Ahlberg's affidavit does not violate Rule 56(c)(4) of the Federal Rules of Civil Procedure.

9

See Fed. R. Civ. P. 56(c)(4); Antonio v. Barnes, 464 F.2d 584, 585 (4th Cir. 1972) (per curiam); King v. N.C. Dep't of Pub. Safety, No. 5:12-CV-152-F, 2014 WL 69601, at *2–3 (E.D.N.C. Jan. 8, 2014) (unpublished). Relatedly, Ahlberg's affidavit does not violate Rule 701 of the Federal Rules of Evidence and the court declines to exclude Ahlberg's affidavit as a sham. As for whether BlackRock violated its duty to supplement its discovery responses, the court denies Duke Energy's motion to strike Ahlberg's affidavit. Instead, the court has considered the competent portions of Ahlberg's affidavit in deciding the parties' motions for summary judgment. King, 2014 WL 69601, at *2–4.

III.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Scott v. Harris, 550 U.S. 372, 378 (2007). "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." Desmond v. PNGI Charles Town Gaming, L.T.C., 630 F.3d 351, 354 (4th Cir. 2011).

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of plaintiff's position [is] insufficient...." Id. at 252.; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248.

Subject-matter jurisdiction is based on federal question jurisdiction. The motions for summary judgment require the court to consider state law claims, and in doing so the court applies state substantive law and federal procedural rules. See Erie R.R. v. Tompkins, 304 U.S. 64, 78–80 (1938); Dixon v. Edwards, 290 F.3d 699, 710 (4th Cir. 2002). North Carolina law applies to the state law claims. Accordingly, this court must predict how the Supreme Court of North Carolina would rule on any disputed state-law issue. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See id. at 369. If there are no governing opinions from that court, this court may consider the opinions of the North Carolina Court of Appeals, treatises, and "the practices of other states." Id. (quotation omitted).[6] In predicting how the highest court of a state would address an issue, this court must "follow the decision of an intermediate state appellate court unless there [are] persuasive data that the highest court would decide differently." Toloczko, 728 F.3d at 398 (quotation omitted); see Hicks v. Feiock, 485 U.S. 624, 630 & n.3 (1988). Moreover, in predicting how the highest court of a state would address an issue, a federal court "should not create or expand a [s]tate's public policy." Time Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted); see Day & Zimmerman, Inc. v. Challoner, 423 U.S. 3, 4 (1975) (per curiam); Wade v. Danek, Inc., 182 F.3d 281, 286 (4th Cir. 1999).

---

[6] North Carolina does not have a mechanism to certify questions of state law to its Supreme Court. See Town of Nags Head v. Toloczko, 728 F.3d 391, 397–98 (4th Cir. 2013).

11

A.

In count one, BlackRock alleges that Duke Energy willfully infringed its copyrights by impermissibly and unauthorizedly reproducing, using, distributing, and inducing the preparation of "derivative works based upon BlackRock's Technical Documents" in violation of the United States Copyright Act of 1976, 17 U.S.C. § 101 et seq. Compl. [D.E. 5] ¶¶ 129–38.

"The power over patent and copyright granted to Congress in Article I, Section 8 of the Constitution is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired." Bouchat v. Balt. Ravens Ltd. P'ship, 737 F.3d 932, 936 (4th Cir. 2013) (quotation omitted); see Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 429 (1984). The Copyright Act grants "a bundle of exclusive rights to the owner of the copyright," including the rights "to publish, copy, and distribute the author's work," to promote the progress of science and the useful arts. Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 546–47 (1985); see U.S. Const. art. I, § 8; Bouchat, 737 F.3d at 936–37.

"Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression . . . from which they can be perceived, reproduced, or otherwise communicated . . . ." 17 U.S.C. § 102(a); see Humphreys & Partners Architects, LP v. Lessard Design, Inc., 790 F.3d 532, 537 (4th Cir. 2015); Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc., 618 F.3d 417, 428 (4th Cir. 2010). "The sine qua non of copyright is originality. To qualify for copyright protection, a work must be original to the author." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 345 (1991) (citation omitted); see 17 U.S.C. § 102(b); Custom Dynamics, LLC v. Radiantz LED Lighting, Inc., 535 F. Supp. 2d 542, 549 (E.D.N.C. 2008). "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal

degree of creativity." Feist Publ'ns, Inc., 499 U.S. at 345 (citation omitted). "[T]he requisite level of creativity is extremely low; even a slight amount will suffice." Id.

To establish copyright infringement, a plaintiff must prove two elements: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original. See id. at 361; Humphreys & Partners Architects, 790 F.3d at 537; Arnett v. Jackson, No. 5:16-CV-872-D, 2017 WL 3493606, at *2 (E.D.N.C. Aug. 14, 2017) (unpublished); Custom Dynamics, 535 F. Supp. 2d at 548. "A certificate of registration issued by the Copyright Office is prima facie evidence of the validity of the copyright and of the facts stated in the certificate, such as ownership." Universal Furniture Int'l, 618 F.3d at 428 (quotation omitted); see 17 U.S.C. § 410(c). When a certificate of registration exists, "the burden shifts to the defendant to prove that the claimed copyrights are invalid." Universal Furniture Int'l, 618 F.3d at 428 (citation omitted).

The fair use exception is codified at 17 U.S.C. § 107. See 17 U.S.C. § 107; Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 576–78 (1994); Bouchat, 737 F.3d at 936–37. Section 107 lists four factors, which are to be weighed together in light of the purposes of copyright, to determine whether a particular use is a fair use:

(1)  the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2)  the nature of the copyrighted work;

(3)  the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4)  the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. The primary focus is on the first factor. See Bouchat, 737 F.3d at 937. "The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." Harper & Row, 471 U.S. at 562 (citation omitted). As for the last factor, the court must consider whether Duke Energy's use "would materially impair the marketability of the work

and whether it would act as a market substitute for it." Bouchat, 737 F.3d at 943 (quotation and citation omitted). Fair use is a complete defense to an infringement claim. See 17 U.S.C. § 107.

The court assumes without deciding that BlackRock owned a valid copyright and that Duke Energy copied the copyrighted work. Even viewing the record in the light most favorable to BlackRock, no rational jury could find that Duke Energy's use did not constitute fair use. Duke Energy submitted BlackRock's copyrighted materials as part of a regulatory process, and Duke Energy previously compensated BlackRock for preparing these materials. BlackRock's drawings had no marketability otherwise because they were specific to the Roxboro Landfill project. Furthermore, considering the scope of BlackRock's copyright infringement claim, Duke Energy used only a portion of BlackRock's total copyrighted work. Examining the record in the light most favorable to BlackRock and weighing the factors in section 107, Duke Energy's use constituted fair use. Accordingly, the court grants Duke Energy's motion for summary judgment on count one.

B.

In count two, BlackRock alleges that Duke Energy breached its contract with BlackRock by "[w]rongfully seeking to terminate the contractual relationship with BlackRock; [w]rongfully acting in bad faith to terminate the Master Contract; [t]erminating the Master Contract [which BlackRock alleges caused substantial inconvenience to Duke Energy]; and [r]efusing to pay BlackRock for work completed. See Compl. [D.E. 5] ¶¶ 139–46.[7]

Under North Carolina law, a breach of contract claim has two elements: (1) the existence of a valid contract and (2) a breach of the terms of that contract. See McLamb v. T.P. Inc., 173 N.C.

---

[7] In its response, BlackRock also claims that Duke Energy breached the implied covenant of good faith and fair dealing by "string[ing] BlackRock along to gain the necessary engineering information and experience for the Roxboro Landfill project, terminat[ing] BlackRock, [and] replac[ing] it with a different Engineer of Record." [D.E. 180] 14–15. Because BlackRock improperly raised this claim for the first time in its response brief, the court declines to consider the argument. See United States ex rel. Graybar Elec. Co. v. Team Constr., LLC, 275 F. Supp. 3d 737, 748 n.3 (E.D.N.C. 2017) (collecting cases).

App. 586, 588, 619 S.E.2d 577, 580 (2005); Cater v. Barker, 172 N.C. App. 441, 445, 617 S.E.2d 113, 116 (2005), aff'd, 360 N.C. 357, 625 S.E.2d 778 (2006); Poor v. Hill, 138 N.C. App. 19, 29, 530 S.E.2d 838, 845 (2000). "Non-performance of a valid contract is a breach thereof unless the person charged shows some valid reason which may excuse the non-performance; and the burden of doing so rests upon him." Cater, 172 N.C. App. at 447, 617 S.E.2d at 117 (quotation and alterations omitted); Blount-Midyette v. Aeroglide Corp., 254 N.C. 484, 488, 119 S.E.2d 225, 228 (1961); see Michael Borovsky Goldsmith LLC v. Jewelers Mut. Ins. Co., 359 F. Supp. 3d 306, 311 (E.D.N.C. 2019); Barbour v. Fid. Life Ass'n, 361 F. Supp. 3d 565, 572 (E.D.N.C. 2019); Abbington SPE, LLC v. U.S. Bank, Nat'l Assoc., 352 F. Supp. 3d 508, 517 (E.D.N.C. 2016), aff'd, 698 F. App'x 750 (4th Cir. 2017) (per curiam) (unpublished).

"[T]he terms of a contract are to be interpreted according to the expressed intent of the parties unless such intent is contrary to law." Offiss, Inc. v. First Union Nat'l Bank, 150 N.C. App. 356, 363, 562 S.E.2d 905, 910 (2002), disc. review denied, 356 N.C. 165, 568 S.E.2d 606 (2002); see Lane v. Scarborough, 284 N.C. 407, 410–11, 200 S.E.2d 622, 624 (1973); Duke Power Co. v. Blue Ridge Elec. Membership Corp., 253 N.C. 596, 602, 117 S.E.2d 812, 816 (1961). The contract between BlackRock and Duke Energy at all times contained a termination for convenience clause and a merger clause. See [D.E. 135] ¶¶ 21, 23, 30–33; [D.E. 184] ¶¶ 21, 23, 30–33. Duke Energy merely exercised its contractual right in terminating its contract with BlackRock. Accordingly, the court grants Duke Energy's motion for summary judgment on count two.

C.

In count three, BlackRock claims that Duke Energy has been unjustly enriched by its allegedly infringing actions. See Compl. [D.E. 5] ¶¶ 147–53. BlackRock admits that "it has dropped its unjust enrichment" claim. [D.E. 184] ¶ 54; see [D.E. 180] 39; [D.E. 39] 35. Accordingly, the court grants Duke Energy's motion for summary judgment on count three.

15

D.

In count four, BlackRock claims that Duke Energy is liable for common law conversion and misappropriation. See Compl. [D.E. 5] ¶¶ 154–61. BlackRock admits that it "has dropped" its conversion and misappropriation claims. [D.E. 184] ¶ 54; see [D.E. 180] 39; [D.E. 39] 35. Accordingly, the court grants Duke Energy's motion for summary judgment on count four.

E.

In count six, BlackRock claims that Duke Energy infringed its trademarks in violation of the North Carolina Trademark Registration Act ("NCTRA"), N.C. Gen. Stat. § 80-1 et seq. [D.E. 5] ¶¶ 166–72. BlackRock and Duke Energy seek summary judgment on this count.

The NCTRA provides "a system of State trademark registration and protection substantially consistent with the federal system of trademark registration and protection under the Trademark Act of 1946, 15 U.S.C. § 1051 et seq." N.C. Gen. Stat. § 80-1.1. "The construction given the federal act should be examined as persuasive authority for interpreting and constructing" the NCTRA. Id. The NCTRA defines two types of conduct as trademark infringement:

> (1) [To] [u]se in [North Carolina] without the consent of the registrant, any reproduction, counterfeit, copy, or colorable imitation of a mark registered under [the NCTRA] in connection with the sale, offering for sale, or advertising of any goods or services on or in connection with which such use is likely to cause confusion or mistake or to deceive as to the source of origin of such goods or services; or
>
> (2) [To] [r]eproduce, counterfeit, copy or colorably imitate any such mark and apply such reproduction, counterfeit, copy or colorable imitation to labels, signs, prints, packages, wrappers, receptacles, or advertisements intended to be used upon or in conjunction with the sale or other distribution in [North Carolina] of such goods or services.

Id. § 80-11; see 15 U.S.C. § 1114(1). BlackRock proceeds under the first prong of the NCTRA. The parties dispute whether Duke Energy used BlackRock's marks "in connection with the sale, offering for sale, or advertising of any goods or services" and whether such use is likely to cause confusion. N.C. Gen Stat. § 80-1.1.

16

To determine whether a likelihood of confusion exists, courts applying federal trademark law consider nine factors:

(1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace;

(2) the similarity of the two marks to consumers;

(3) the similarity of the goods or services that the marks identify;

(4) the similarity of the facilities used by the markholders;

(5) the similarity of advertising used by the markholders;

(6) the defendant's intent;

(7) actual confusion;

(8) the quality of the defendant's product; and

(9) the sophistication of the consuming public.

Variety Stores, Inc. v. Wal-Mart Stores, Inc., 888 F.3d 651, 660 (4th Cir. 2018); see Grayson O Co. v. Agadir Int'l LLC, 856 F.3d 307, 314 (4th Cir. 2017); Ga. Pac. Consumer Prods., LP v. Von Drehle Corp., 618 F.3d 441, 454 (4th Cir. 2010); George & Co. v. Imagination Entm't Ltd., 575 F.3d 383, 393 (4th Cir. 2009). "Not all of these factors will be relevant in every trademark dispute, and there is no need for each factor to support the plaintiff's position on the likelihood of confusion issue." Variety Stores, Inc., 888 F.3d at 660 (alteration and quotation omitted). In evaluating the likelihood of confusion, the court may consider whether "it can be shown that public confusion will adversely affect the plaintiff's ability to control [its] reputation among its laborers, lenders, investors, or other group with whom plaintiff interacts." Ga. Pac. Consumer Prods., 618 F.3d at 453 (quotation omitted).

Even assuming that BlackRock's trademark infringement claim is not merely a repackaged copyright infringement claim, see Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 34 (2003), and even assuming that Duke Energy used BlackRock's marks in connection with the sale of electricity, and even considering the record in the light most favorable to BlackRock, BlackRock

has not produced evidence from which a rational jury could find that Duke Energy's use is likely to cause confusion. First, BlackRock has not produced evidence of the strength of its trademarks. See Variety Stores, Inc., 888 F.3d at 663 (listing factors); Grayson O Co., 856 F.3d at 314–17. Second, no rational jury could find that Duke Energy intended to confuse consumers or infringe BlackRock's marks. Cf. Variety Stores, Inc., 888 F.3d at 665. Third, BlackRock has not produced evidence of actual confusion, particularly how AMEC's modifications could cause confusion to the public. "[T]he absence of any evidence of actual confusion over a substantial period of time creates a strong inference that there is no likelihood of confusion." Id. at 666 (alteration and quotation omitted); see George & Co., 575 F.3d at 398; CareFirst of Md., Inc. v. First Care, P.C., 434 F.3d 263, 269 (4th Cir. 2006); Grayson O Co., 856 F.3d at 319–20. Finally, BlackRock offers little evidence that Duke Energy's submissions have interfered with BlackRock's ability to control the quality of its products, thereby causing risk of injury to the reputation of BlackRock's marks. See, e.g., Ga. Pac. Consumer Prods., 618 F.3d at 455. Accordingly, viewing the record in the light most favorable to BlackRock, the court grants Duke Energy's motion for summary judgment on count six and denies BlackRock's motion for summary judgment on count six.

F.

In count five, BlackRock claims that Duke Energy's use of its technical drawings, which "prominently display BlackRock's service mark and logo," violates common law unfair competition [D.E. 5] ¶¶ 162–66. "The North Carolina common law of unfair competition in the context of trademarks is similar to the federal law of trademark infringement." Re/Max LLC v. M.L. Jones & Assocs., Ltd., No. 5:12-CV-768-D, 2014 WL 7405461, at *4 (E.D.N.C. Dec. 30, 2014) (unpublished) (alteration and quotation omitted); see Polo Fashions, Inc. v. Craftex, Inc., 816 F.2d 145, 148 (4th Cir. 1987); Charcoal Steak House of Charlotte, Inc. v. Staley, 263 N.C. 199, 201–03, 139 S.E.2d 185, 187–88 (1964). BlackRock and Duke Energy move for summary judgment on this count.

18

To establish trademark infringement under federal law, BlackRock must prove that (1) it owns a valid mark; (2) Duke Energy used the mark in commerce and without BlackRock's authorization; (3) Duke Energy used the mark, or an imitation of it, in connection with the sale of goods and services; and (4) Duke Energy's use of the mark is likely to confuse customers. See 15 U.S.C. § 1114(1)(a); Rosetta Stone Ltd. v. Google, Inc., 676 F.3d 144, 152 (4th Cir. 2012); George & Co., 575 F.3d at 393; Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC, 507 F.3d 252, 259 (4th Cir. 2007); People for Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 364 (4th Cir. 2001).

Even assuming that Duke Energy and BlackRock are competitors, see [D.E. 135] ¶ 3; [D.E. 184] ¶ 3, and even assuming that the Copyright Act does not preempt BlackRock's unfair competition claim, no rational jury could find that Duke Energy infringed BlackRock's trademark. Viewing the record in the light most favorable to BlackRock, BlackRock cannot establish a likelihood of confusion based on Duke Energy's use of BlackRock's technical drawings in its regulatory submission. Accordingly, the court grants Duke Energy's motion for summary judgment on count five and denies BlackRock's motion for summary judgment on count five.

G.

In count seven, BlackRock alleges that Duke Energy's trademark infringement also violates the UDTPA. See Compl. [D.E. 5] ¶¶ 173–79; [D.E. 180] 39–40. Because BlackRock's UPDTA claim depends on the success of its trademark infringement claim, see [D.E. 180] 39–40, and because no rational jury could find that Duke Energy's conduct violates the NCTRA, the court grants Duke Energy's motion for summary judgment on count seven.

H.

In its counterclaim, Duke Energy alleges that BlackRock committed fraud on the Copyright Office when BlackRock submitted copyright applications for the Phase 6 PTC and the Phase 6A

CQA Report. See Countercl. [D.E. 99] ¶¶ 23–34. Duke Energy and BlackRock move for summary judgment on Duke Energy's counterclaim.

"A claim alleging fraud on the Copyright Office is only available where the registrant is alleged to have made false representations of <u>fact</u> with the requisite intent to defraud." <u>Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.</u>, 948 F. Supp. 2d 538, 558 (D. Md. 2013). Even viewing the record in the light most favorable to Duke Energy, no rational jury could find that BlackRock made false representations with the intent to defraud the Copyright Office. Although Duke Energy alleges that BlackRock made false representations to the Copyright Office, no rational jury could find that BlackRock made any such representations with the intent to defraud the Copyright Office. See [D.E. 135] ¶¶ 40–54. Accordingly, the court grants BlackRock's motion for summary judgment and denies Duke Energy's motion for summary judgment on Duke Energy's counterclaim.

## IV.

In sum, the court GRANTS IN PART and DENIES IN PART BlackRock's motion for partial summary judgment [D.E. 120], GRANTS IN PART and DENIES IN PART Duke Energy's motion for summary judgment [D.E. 132], GRANTS IN PART and DENIES IN PART Duke Energy's first motion to strike [D.E. 161], DENIES Duke Energy's second motion to strike [D.E. 204], GRANTS BlackRock's motion for an extension [D.E. 222], and DENIES as moot Duke Energy's motion for adjudication [D.E. 224]. The clerk shall close the case.

SO ORDERED. This 9 day of September 2019.

JAMES C. DEVER III
United States District Judge

20